IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

LORI LARSON,                    )
                                )
              Plaintiff,        )
                                )
       v.                       )  Case No.
                                )  10-6016-CV-SJ-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security,             )
                                )
              Defendant.        )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Lori Larson seeks review of the final decision of
the Commissioner of Social Security denying plaintiff's
application for disability benefits under Title II of the Social
Security Act ("the Act"). Plaintiff argues that the ALJ erred in
discrediting the opinion of treating physician Dr. Christensen.
I find that the substantial evidence in the record as a whole
supports the ALJ's finding that plaintiff is not disabled.
Therefore, plaintiff's motion for summary judgment will be denied
and the decision of the Commissioner will be affirmed.

## I.  BACKGROUND

On July 20, 2006, plaintiff applied for disability benefits
alleging that she had been disabled since September 20, 2002.
Plaintiff's disability stems from chronic fatigue syndrome.
Plaintiff's application was denied on November 9, 2006. On April
2, 2009, a hearing was held before an Administrative Law Judge.
On June 2, 2009, the ALJ found that plaintiff was not under a

"disability" as defined in the Act.  On October 27, 2009, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.   *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff; her husband, Thorn Larson; and vocational expert Barbara Myers, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record shows that plaintiff earned the following income from 1976 through 2001:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1976 | $ 1,564.55 | 1989 | $18,839.80 |
| 1977 | 4,940.08 | 1990 | 19,167.81 |
| 1978 | 4,960.05 | 1991 | 19,569.20 |
| 1979 | 4,570.26 | 1992 | 20,419.78 |
| 1980 | 7,919.87 | 1993 | 20,775.75 |
| 1981 | 7,936.21 | 1994 | 21,893.28 |
| 1982 | 12,935.74 | 1995 | 21,947.36 |
| 1983 | 14,860.17 | 1996 | 23,009.37 |
| 1984 | 14,984.78 | 1997 | 23,018.48 |
| 1985 | 12,101.41 | 1998 | 24,974.30 |
| 1986 | 16,848.60 | 1999 | 27,359.67 |
| 1987 | 17,198.37 | 2000 | 27,031.47 |
| 1988 | 18,474.64 | 2001 | 12,551.54 |

(Tr. at 89).

Plaintiff had no earnings from 2002 through 2008 (Tr. at 91, 93).

**B.    *SUMMARY OF MEDICAL RECORDS***

On March 5, 2002, plaintiff saw Tyron Arnott, M.D., for a physical exam (Tr. at 151).  She said she was told by Dr. Naguwa she may not be getting restorative sleep.  She was given Paxil but did not think it had helped.  Plaintiff reported that her depression had improved with Celexa and she wished to continue that medication.  Plaintiff reported continuing low grade fevers, generalized fatigue, and joint pain.  Plaintiff was able to get on and off the exam table without assistance.  Dr. Arnott prescribed Trazodone for sleep assistance.

On April 10, 2002, plaintiff was seen by Rajiv Pathak, M.D., a neurologist, at the request of the Department of Social Services, Disability Evaluation Division (Tr. at 170-174). Plaintiff reported that Celexa helps her depression and Trazodone helps her insomnia.  She reported that her balance was "off," she had pain in her knees which caused her to fall frequently.  She reported constant mild neck pain and mild low back pain.  In the mornings she was tired.  She said tried to do mild exercises and reported that her memory was okay.

On exam plaintiff had normal range of motion in her shoulders, elbows, wrists, hands, fingers, hips, and ankles, with

no tenderness in any of those areas.  She had essentially normal range of motion with tenderness in her knees.  She had no tenderness in her feet.  She was able to arise easily from the exam table, her station was normal, she walked freely around the room, she was able to tandem walk and walk on her toes and heels without difficulty.  "She does not have any tender points so I do not think this is fibromyalgia.  I would suspect it is more like chronic fatigue syndrome.  Treatment for that is going to remain symptomatic. . . .  The patient can sit for about 6 hours in an 8-hour day.  She can stand and/or walk for 6 hours in an 8-hour day.  With repetitive bending, climbing and stooping, she is likely to experience more knee pain, low back pain, and is likely to get tired.  She does not have any limitation of vision, speech, or hearing.  She can lift 10 pounds on a frequent basis, and up to 25 pounds on an occasional basis."

On May 6, 2002, plaintiff was seen at the University of California Davis Medical Group by James Leek, M.D., a rheumatologist, at the request of Dr. Arnott (Tr. at 167-169; 202-203).  Plaintiff reported taking Trazodone as needed for sleep, that it had been "somewhat helpful when taken, but not taken very often."  Plaintiff was able to be up and around for an hour or two with rest breaks between ambulatory activities.  She reported walking her 50 yard driveway three times per day.  She

had no frank muscle weakness.  Plaintiff previously had a
positive ANA[1] blood test.  After performing a thorough physical
exam, Dr. Leek found that plaintiff "does not have a diagnosable
definite systemic rheumatic disease, although constellation of
symptoms may represent an undifferentiated connective tissue
disease.  I would recommend the use of her Trazodone 25 to 50 mg
at bedtime on a regular basis."  He also recommended she take 81
mg of aspirin a day (adult low strength).  He recommended further
blood work and a gradual conditioning program.

On June 4, 2002, plaintiff saw Dr. Arnott complaining of
low-grade fevers, generalized fatigue, knee pain and elbow pain
(Tr. at 150).  She continued to have a low energy level despite
taking Trazodone which had been recommended by the rheumatolo-
gist.  She said she had been sleeping eight hours per night but
did not feel restored.  She was assessed with chronic fatigue/

--------

[1]An ANA test detects proteins called antinuclear antibodies
in the blood.  The immune system normally makes antibodies to
help fight infection.  The antibodies detected in an ANA test are
different -- they may attack the body's own tissues.  A positive
ANA test indicates that the immune system has launched a
misdirected attack on the body's own healthy tissue -- in other
words, an autoimmune reaction.  Because connective tissue is
often the target of autoimmune reactions, the resulting diseases
are known as connective tissue diseases.  Examples include lupus,
rheumatoid arthritis and scleroderma.  The result of an ANA test
does not prove that a patient does or does not have a connective
tissue disease.  Along with other tests, an ANA test helps narrow
the range of possible diagnoses if other factors suggest that the
illness is the result of an autoimmune reaction.
http://www.mayoclinic.com/health/ana-test/MY00787.

myalgias [pain in muscles] of unknown etiology.  She was prescribed Piroxicam [non-steroidal anti-inflammatory] and told to have blood work done, and she was told to increase her Trazodone.

On July 15, 2002, plaintiff saw Dr. Leek, a rheumatologist, for follow up (Tr. at 200-201).  After exam, Dr. Leek assessed persistent fatigue with some arthralgias [pain in joints] and myalgias and mild sicca [dryness] complaints, "although some of these may relate to the use of trazodone. . . . this is a difficult constellation of symptoms to be sure about a diagnosis; however, with her positive ANA persistently, this may represent an undifferentiated connective tissue disease.  She was previously on a trial of Plaquenil [treats rheumatoid arthritis] and I would not suggest any stronger immunosuppressive therapy for her.  I have suggested that she continue her stretching and the conditioning program and treatment of her sleep disturbance."

On August 22, 2002, plaintiff saw Shahram Ardalan, Ph.D., for a consultative evaluation (Tr. At 163-165).  She had been referred by the Department of Social Services, Disability Evaluation Division.  Plaintiff reported decreased energy and stamina and poor concentration.  She said Celexa had helped her depression and she was taking Trazodone for sleep problems.

**Present Daily Activities:** She wakes up between 9:00 AM to 10:00 AM.  She reported that she usually has a bowl of

9

cereal and sits on the couch a lot to watch television. She reported that she tries to move around as much as she can but her movement is limited by her fatigue. She tries to do a load of laundry with her husband's help. She reported that she used to do all the cooking but at this time her husband does most of it. Her husband cleans the house, goes grocery shopping, and takes care of the finances.

**Mental Status Examination:** Lori was oriented to person, place, and time. She appeared her stated age and was well dressed and groomed. She maintained good eye contact throughout the session. She was a reliable historian. She reported that her mood is mostly "frustrated" and her affect was full range and appropriate to context. Her speech was fluent and the tone, volume, and the rate of her speech were normal. Her thought process was unimpaired. Her insight and judgment were fair. She obtained a score of 30 out of 30 on the Mini Mental Status Examination, which contra-indicates significant cognitive impairment.

Plaintiff was assessed with depressive disorder not otherwise specified due to chronic fatigue with a GAF of 63.[2]

Due to her fatigue, she has slight to moderate difficulty in maintaining social function. She has slight to moderate difficulty with concentration, persistence, and pace. She is capable of understanding, carrying out, and remembering simple instructions but would have slight difficulty with more complex tasks. Her ability to respond appropriately to co-workers, supervisors, and the public is not impaired based on her presentation in the interview. Her ability to respond appropriately to usual work situations is unimpaired from a psychological standpoint. Her ability to respond to changes in a routine work setting is slightly to moderately impaired. In summary, Lori's slight psychological problems are secondary to her medical condition.

September 20, 2002, is plaintiff's alleged onset date.

---

[2]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

On September 23, 2002, plaintiff returned to see Dr. Leek, a rheumatologist, for a follow up of fatigue and arthralgias (joint pain) (Tr. at 199). She reported sleeping better on Trazodone, 100 mg taken at bedtime. She had been taking 20 mg of Piroxicam (non-steroidal anti-inflammatory) daily "with improved arthralgias of her knees. She is doing some isometric quadriceps strengthening exercises and doing some walking as well as a stretching regimen." Plaintiff reported persistent fatigue. On exam plaintiff had midtrapezius tenderness, tenderness in the right medial scapular area and in the medial knees. She had full range of motion of all joints except her left elbow. Dr. Leek assessed persistent fatigue, arthralgias predominantly in the knees, myalgias (muscle pain) and mild xerostomia (dry mouth) of unknown etiology. Dr. Leek made no recommendation due to plaintiff's "leaving shortly for Missouri."

On February 26, 2003, plaintiff saw Samang Kim, D.O. (Tr. at 265-266). She said she had been feeling tired and noticed that Trazodone did not seem to be working as well as it once had. "Occasionally she admits she has joint pains in the knee, elbows and the wrist." Dr. Kim discontinued Trazodone and prescribed Ambien.

On March 19, 2003, plaintiff saw Dr. Kim for a follow up on insomnia (Tr. at 264). Plaintiff reported that Ambien had been

helping her "significantly" and she wanted a refill. "[S]he has a history of depression with chronic fatigue syndrome. Had been placed on Celexa. She stated it is no longer working because it gives her some sedating effect. She wants to know whether we can switch her to Zoloft. She read some good things about it." Plaintiff's weight was 135 1/2 pounds, temperature was 97.8, pulse was 88. Plaintiff's physical exam was normal. Dr. Kim refilled plaintiff's Ambien and prescribed Zoloft in place of Celexa.

On April 9, 2003, plaintiff saw Dr. Kim for a refill on Zoloft (Tr. at 260-261). "We put the patient on Zoloft 50 mg daily for chronic back pain and bouts of depression. She stated that appears to be helping her. She needs refill on that medicine." Plaintiff also asked to have some moles removed. "Otherwise she has been doing fair. Denies significant other problems."

On April 21, 2003, plaintiff saw Dr. Kim for a follow up (Tr. at 259). She said her depression was responding to Zoloft and asked for more samples.

On July 30, 2003, plaintiff saw Dr. Kim for a refill of Ambien (Tr. at 258). Plaintiff weighed 132 pounds. Her blood pressure was 128/82, temperature 99.8, pulse 72. Her exam was normal. Dr. Kim assessed ear infection, insomnia, and history of

chronic fatigue syndrome.  He gave her a prescription for antibiotics for her infection, Ambien for sleep, and told her to take Tylenol for aches and pains.

On May 10, 2004, plaintiff saw Dr. Kim for medication refills and to follow up on labs (Tr. at 254).  "She has been experiencing recurrent bouts of chronic fatigue with fibro-myalgia."  Plaintiff had seen numerous physicians including a rheumatologist.  She wanted to get Dr. Kim's opinion on the lab work and prescriptions she had been given.  "Musculoskeletal examination seems to indicate nonspecific trigger point consistent with fibromyalgia."  Dr. Kim recommended plaintiff return to a rheumatologist.  He refilled her Ambien, Zoloft, and acne medication and told her to take Tylenol for aches and pains.

On July 1, 2004, plaintiff saw Dr. Kim complaining of pressure behind the left eye, ear pain, and headache (Tr. at 253).  "The symptoms she came in to see me for just exist within the last four to five days."  Plaintiff was angry about having to wait several hours to see Dr. Kim.  Her blood pressure was 102/60, pulse was 72, temperature was 99.6.  Her exam was normal. She was diagnosed with a sinus infection.

On October 28, 2004, plaintiff was seen by Joseph Brewer, M.D. (Tr. at 205-206).  He recounted plaintiff's summary of her symptoms since 2001.  "Since then, her symptoms tend to wax and

wane." She said her symptoms included moderate to severe fatigue
and exhaustion, awakening unrested after adequate amounts of
sleep, increased sleep requirements of 10 to 12 hours at night
and naps during the day; inability to exercise; worsening of her
symptoms after activity; muscle and joint pain; weakness in her
arms and legs; difficulties with short-term memory, concentra-
tion, attention span, and retention; recurring headaches; blurred
vision; and light and sound sensitivity. He talked to the
plaintiff and her husband about chronic fatigue syndrome and
fibromyalgia and recommended she get an NK function assay.[3] The
test was normal (Tr. at 207, 210). However Joseph Brewer, M.D.,
an infectious disease specialist, indicated that it was toward
the lower end of the normal range and may be significant because
a low NK function is often found in patients with chronic fatigue
syndrome and HHV-6 infection.[4]

---

[3]Natural Killer Cell Function. This assay evaluates the
functional capacity of natural killer cells. Natural killer
cells mediate killing of virally infected cells and tumor cells.
Decreased natural killer cell function has been observed in
patients with recurrent viral infections and cancer patients.
http://www.ibtlabs.com/library/PDF/NK%20Function_rev_062309.pdf

[4]Human Herpesvirus 6 (HHV-6) is an immunosuppressive and
neurotropic virus that can cause encephalitis and seizures during
a primary infection or when reactivated from latency in
immunosuppressed patients. New research suggests that HHV-6 may
play a role in several chronic neurological conditions including
chronic fatigue syndrome. http://www.hhv-6foundation.org

On March 7, 2005, plaintiff saw Dr. Kim for a physical (Tr. at 247-248). "No visual loss, visual change." Plaintiff weighed 138 pounds, her blood pressure was 132/80, pulse was 64. Her exam was normal. She was assessed with chronic fatigue syndrome.

On April 4, 2005, plaintiff saw Dr. Kim for a follow up on lab work, all of which was normal (Tr. at 246). A bone density study of her lumbar spine was normal. Plaintiff's weight was 139 pounds. Her blood pressure was 110/70; pulse was 76. "I think I am going to go ahead and recommend the patient continue with current diet, exercise, weight loss, healthy diet, decreased fat intake, decrease salt intake."

On June 10, 2005, plaintiff saw Carol Constant, R.N., complaining of dizziness, lightheadedness, chest tightness, variable pulse, and hypotension (low blood pressure) (Tr. at 245). She stated that these "episodes" happened "quite erratically and intermittently. She is not able to associate them with any activity or stress." On exam plaintiff's blood pressure was 122/82. Her pulse was 76. Her exam was normal. It was recommended that she proceed to the emergency department in case her chest tightness was cardiac in nature.

On March 6, 2006, plaintiff saw Dr. Kim (Tr. at 243-244). She complained of aches and pains for the past three weeks and lower right quadrant and pelvic pain. Dr. Kim performed an exam

and a urinalysis.  Plaintiff said "the pain is not too bad."  Dr.
Kim recommended blood work and an ultrasound of the pelvis and
abdomen.

On March 7, 2006, plaintiff saw Dr. Kim for a follow up on
right quadrant pain and right pelvic pain.  "Pain is still about
the same.  It is tolerable." (Tr. at 241-242).  Plaintiff had a
pelvic ultrasound which revealed a cyst in the liver and cysts on
the ovaries.  "Will await for the final radiology interpreta-
tion."  Her blood work and chemistry profile were "fairly
unremarkable."  Dr. Kim performed a physical exam and then
recommended a CT scan of the abdomen and pelvis.

On June 5, 2006, plaintiff saw Dr. Kim (Tr. at 237).  She
complained of weight loss (six pounds over the past three
months), low grade fever, fatigue, and myalgia "much more
pronounced within the last several weeks."  Dr. Kim performed a
physical exam.  He assessed weight loss, low grade fever,
fatigue, myalgia, and history of chronic fatigue syndrome.  He
ordered blood work.

On June 14, 2006, plaintiff saw Carol Constant, R.N., to
review lab results (Tr. at 235-236).  "Patient has no other
specific complaints of pain or discomfort."  Plaintiff indicated
she had not been trying to lose weight.  She was assessed with
chronic fatigue syndrome and weight loss.

On June 19, 2006, plaintiff saw Carol Constant, R.N. (Tr. at 234, 238). Ms. Constant told plaintiff her TSH and FREE T4 lab tests were completely normal. Plaintiff reported continued profound fatigue and an inability to participate in normal activities of daily living. Plaintiff had "no complaints of pain or discomfort on today's visit other than her chronic fatigue and intermittent joint pain which is nothing new for her." Plaintiff "quit taking her Ambien since she was having what she feels was some impaired memory while on them." Ms. Constant suggested plaintiff see a doctor who specializes in chronic fatigue syndrome, and plaintiff was given a prescription for Rozerem as needed for sleep.

On September 5, 2006, plaintiff saw Gordon Christensen, M.D., with a chief complaint of fatigue (Tr. at 286, 292-296). She requested a second opinion on her diagnosis and proposed therapy.

> Patient states she has "chronic fatigue syndrom that began abruptly in April 2001 with an episode of the "flu." The flu illness manifested itself as a sore throat, sinus congestion, fever – reportedly to 102°F, sore neck, retro-bulbar headache, and generalized achiness that lasted for 2-7 days and was followed by waning and waxing fatigue from which she has never recovered. Because of her illness, she states she spent "April to November" "in bed" last year.

> Regarding her fatigue: She finds that if she over-exerts herself, her fatigue becomes worse. For example, in May her Mother visited her in May of this year, the patient "over did" with her Mother's visit, putting her in bed for 5 weeks. Her normal bedtime is 9 PM and her normal arousal

time is 7-8 AM. She reports nighttime arousals despite her Ambien CR therapy.  Despite the full rest period she finds that sleep does not refresh her.  Because of the fatigue, she has voluntary [sic] refrained from working since April of 2001.  Because of her fatigue she has also diminished her household activities; she showers every 2-3 days, occasionally she does the laundry or cooks a meal.  Because of her illness, her husband cleans the home, maintains the house & the yard, does the shopping, and takes care of the household finances.

* * * * *

Regarding self reported cognitive changes:  She reports a diminished ability to "concentrate," meaning she believes she has diminished ability to comprehend and retain spoken and written information.  She also reports word searching and she is forgetful of telephone numbers.  This problem waxes and wanes, but is generally worse when her fatigue is most severe.  Finally, she reports that since becoming ill she is more emotional than she believes is normal for her.

Regarding headache:  She is bothered by a chronic, retro-bulbar, "throbbing," "dull," annoying headache that normally lasts all day.  She finds that light and sound exacerbate her headache and dark and quiet help relieve her headache. She finds that "2 or 3" ibuprofens will help relieve her headache.  She also has "blurry" vision.

Regarding musculoskeletal pain:  She reports muscle pains, and joint pains.  She finds that immobility, such as driving 3 hours for this evaluation, leaves her feeling "achy."  She also finds that activity – particularly going up and down stairs – exacerbates her musculoskeletal pains, but changes in the weather and emotional stress do not exacerbate this complaint.  She scores the pain (on a scale of 1 to 10 with 10 maximal) as follows: neck: "5/10," both shoulders: "4/10," both elbows:  "5/10," all 10 PIP in her hands: "5/10," both knees:  "4/10," and both hips:  "4/10."  She feels her arms and legs are "weak."  She also reports her lower extremities are "numb and "tingly."

* * * * *

. . .  Most recently she has been evaluated by Dr. Brewer of Kansas City.  She states he offered her therapy with "immune

care 54," but she finds that the cost of "$140 a month" is too expensive, so she has requested a second opinion. . . .

Plaintiff reported no musculoskeletal pain (Tr. at 292).

Dr. Christensen performed a physical exam (Tr. at 293).

<u>Assessment Forms</u>:
<u>Fibromyalgia worksheet</u>:  Patient has wide spread pain, morning stiffness, fatigue, and insomnia with nonrestorative sleep; patient also has 13 of 18 positive tender points (as defined by the American college of rheumatology), but she also had 1/3 standard control negative tenderpoints, 3/4 non-standard control negative tenderpoints, and 0/2 non-standard control *positive* tenderpoints; the patient was also tender over the temples. . . .  The results are consistent for fibromyalgia but not diagnostic by American College of Rheumatology criteria because of the discordance between the diagnostic and control negative tender-points.

<u>Chronic Fatigue worksheet</u>:  Patient reports:
    > Persistent or relapsing fatigue that does not resolve with bedrest and results in substantial reduction in occupational, educational, or personal activities.
   >  Satisfactory exclusion of other chronic conditions.
   >  The following symptoms have persisted or recurred during 6 or more consecutive months and not predated the fatigue.
        >>  Post-exertional malaise
        >>  Sore throat
        >>  Lymph node pain in anterior or posterior cervical or axillary chains
        >>  Myalgia
        >>  Headaches of a new type/pattern/severity
        >>  Multi-joint pain without joint swelling or redness
        >>  Self reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, social, or personal activities
         >>  Unrefreshing sleep

19

Presuming a negative work-up, by these criteria the patient has chronic fatigue syndrome.

(Tr. at 293-294).

Dr. Christensen reviewed records of Dr. Bronson, a rheumatologist, dated March 2003 wherein he did not offer a specific diagnosis after a normal physical examination; a normal FANA panel[5]; a normal cardiolipin antibody panel; normal blood work from March 26, 2003; negative lyme serology on April 23, 2004; elevated HSV 1 and 2 serology on April 23, 2004; elevated EBV serology on April 23, 2004; normal complete blood count on May 28, 2004; normal lab results on July 16, 2004; elevated EBV serology on July 16, 2004; a diagnosis by Dr. Brewer on October 28, 2004, of chronic fatigue syndrome/fibromyalgia; normal lab work on October 28, 2004; a letter from Dr. Brewer dated November 9, 2004, indicating a concern for a low normal natural killer cell function; and normal lab results from June 2006.  His assessment reads as follows:

The patient describes clinically significant fatigue and insomnia.  The patient has a physical examination suggestive, but not conclusive, for Fibromyalgia.  The patient demonstrates mild anxiety and depression.  She satisfies criteria for Chronic Fatigue Syndrome.  At this time the patient does not have any other objective findings of disease.  Presuming laboratory analysis is unremarkable, Chronic Fatigue Syndrome (with a presentation also consistent with fibromyalgia, demonstrating the close relationship between these two entities) would be the most likely diagnosis.

---

[5]Fluorescent Antinuclear Antibody (see footnote 1).

Dr. Christensen ordered blood work, urinalysis, chest x-ray, and a sleep study. He "discussed the nature of her probable illness and the lack of curative therapy but the presence of many agents for symptomatic relief."

On September 12, 2006, plaintiff participated in a sleep study which showed a 65% sleep efficiency and periodic limb movements for which treatment was suggested (Tr. at 298-299, 328-329).

On October 17, 2006, plaintiff saw Dr. Christensen for a follow up (Tr. at 301-304). The chief complaint was listed as, "Multiple problems – primarily fatigue; patient seeking a second opinion regarding the diagnosis of 'Chronic Fatigue Syndrome,' made by Dr. Brewer and an opinion on Dr. Brewer's recommendation for expensive immune therapy." Plaintiff requested information regarding filing for Social Security disability because of her fatigue. Plaintiff had stopped taking Ambien because she said it did not help her sleep. Plaintiff was weighed and her vital signs were checked, but there was no further physical examination. "I spent most of the 60 minute visit reviewing Dr. Brewer's evaluation and recommended therapy, the differential diagnosis for fatigue, the nature and prognosis of Chronic Fatigue Syndrome, and other patients' experiences when seeking Social Security disability." Dr. Christensen recommended

plaintiff undergo stamina testing and training and prescribed Clonazepam for insomnia.

A note appears at the bottom of this record. It reads as follows: "Note: The day after I saw the patient I received a copy of a sleep study . . . . the study showed insomnia with significant initial insomnia and diminished REM latency. She did not demonstrate slow wave sleep and a sleep efficiency of 65%. She did not demonstrate sleep apnea, but she did demonstrate frequent arousals due to periodic limb movement disorder. The reader, Dr. Stevens, recommended treatment for periodic limb movement disorder and management by a sleep specialist. This report changes the diagnosis to fatigue due to a dysomnia due to a periodic limb movement disorder. I have advised the patient by phone of this result and advised that she should be seen by a sleep specialist. I also advised her to continue to take the clonazepam as this has been effective in the management of this disorder. She reported over the phone that the clonazepam was helping her sleep."

On November 7, 2006, Paul Stuve, Ph.D., completed a Psychiatric Review Technique finding that plaintiff's mental impairment was not severe (Tr. at 305-317). In support of this finding, Dr. Stuve stated in part, "Pain affects her ability to concentrate and follow directions. The MER [medical records]

include no current discussion of mental problems.  Functional limitations due to depression are not severe."

On November 14, 2006, plaintiff saw Dr. Christensen for a follow up on fatigue (Tr. at 371-374).  Plaintiff reported improved sleep on Clonazepam but still had trouble going to sleep and staying asleep.  Dr. Christensen performed a physical exam and observed that plaintiff was in no apparent distress, was alert and oriented times three, was pleasant and conversant.  Dr. Christensen wrote, "Patient met American College of Rheumatology (ACR) tenderpoint criteria for fibromyalgia, but she also had additional negative-control tenderpoints:  17/18 ACR tenderpoints were positive, 3/3 standard negative-control points were positive, 0/4 non-standard negative-control points were positive, 0/2 non-standard positive-control points were positive, and 2/9 non-ACR tender points were positive.  (With severe disease, control points may be positive.)."  He refilled her Clonzaepam 1 mg, started her on Cyclobenzaprine (muscle relaxant), and told her to continue physical therapy[6] and return in six to eight weeks.

On December 4, 2006, plaintiff was seen by Damien Stevens, M.D., of Midwest pulmonary Consultants, to review her sleep study (Tr. at 325-327).  "She was eventually started on clonazepam 1 mg

---

[6]There are no physical therapy notes in the record.

a night around one month ago.  Since then, she has been able to
fall asleep within 20 minutes and only wakes up a couple of times
a night.  She is always able to fall back asleep within five
minutes.  She wakes up after around 9 to 10 hours sleep and feels
fairly alert throughout the day.  She has actually never had
significant daytime sleepiness. . . .  Her main complaint is
still severe fatigue.  She notes worsening fatigue as she exerts
herself more during the daytime.  In addition, if she exerts
herself more, she requires more sleep overnight."  Plaintiff
denied any depression, anxiety, or other psychiatric complaints.
Dr. Stevens noted that plaintiff has a long history of fatigue
"which I doubt is related to a primary sleep disorder.  Given the
fact that she has only occasional limb movements and her husband
has never been aware of limb movements, I do not think she
requires treatment for periodic limb movement."  Dr. Stevens told
plaintiff to continue taking Clonazepam and return in six months.

December 31, 2006, is plaintiff's last insured date.

On January 2, 2007, plaintiff saw Dr. Christensen for a
follow up on fatigue (Tr. at 367-370).  Plaintiff reported
improved sleep on Clonazepam at 2 mg per night.  Dr. Christensen
performed a physical exam and observed that plaintiff was in no
apparent distress, was alert and oriented times three, was
pleasant and conversant.  Dr. Christensen wrote, "Patient met

24

American College of Rheumatology (ACR) tenderpoint criteria for fibromyalgia, but she also had additional negative-control tenderpoints:  13/18 ACR tenderpoints were positive, 1/3 standard negative-control points were positive, 2/4 non-standard negative-control points were positive, 2/2 non-standard positive-control points were positive, and 5/9 non-ACR tender points were positive.  (With severe disease, control points may be positive.)."  He increased her Clonazepam to 3 mg, refilled her Cyclobenzaprine for pain, and told her to continue physical therapy and return in six to eight weeks.

On February 27, 2007, plaintiff saw Dr. Christensen for a follow up on fatigue (Tr. at 363-366).  Plaintiff reported not doing well, spending much of her day in bed with exhaustion, not showering, and taking daily naps.  Her cognitive problems had reportedly improved since she stopped taking Ambien.  Plaintiff complained of aches after immobility, exercise, and changes in the weather.  Dr. Christensen performed an exam and observed that plaintiff was in no apparent distress, alert and oriented time three, pleasant and conversant.  Dr. Christensen wrote, "Patient met American College of Rheumatology (ACR) tenderpoint criteria for fibromyalgia, but she also had additional negative-control tenderpoints:  13/18 ACR tenderpoints were positive, 3/3 standard negative-control points were positive, 0/4 non-standard negative-

control points were positive, 2/2 non-standard positive-control points were positive, and 7/9 non-ACR tenderpoints were positive. (With severe disease, control points may be positive.)." He refilled her medications, "increased" her Clonazepam to 2 mg[7] at night, told her to continue stretching exercises, and to return in six to eight weeks.

On April 6, 2007, plaintiff was seen by William Breckenridge, Psy.D., a licensed psychologist, after having been referred by Dr. Christensen (Tr. at 320). "The patient does not report any symptoms of depression. Apparently the Zoloft is just being prescribed to help reduce some situational anxiety that the patient has experienced because of her conditions. The patient is also being prescribed Colazepam which has helped her to relax and sleep better at night. The patient is being prescribed Cyclobenzaprine 5 mg p.r.n. [as needed] to deal with pain." Plaintiff was observed to "readily" enter the office, she was cooperative and pleasant, nicely dressed, and her grooming and hygiene were fine. She was "reasonably verbal and quite articulate" with good eye contact. "The patient presents with a full and appropriate affect. Her mood appears to be positive. The patient appears to be of above average intelligence. . . .

---

[7]Although the record says Dr. Christensen increased plaintiff's dose to 2 mg, the appointment before this one about two months earlier shows that he increased it to 3 mg. Therefore, a 2-mg dose would be a decrease, not an increase.

She enjoys reading for a hobby but reports that she has had some problems with aphasia,[8] short-term memory, and probably concentration." Dr. Breckenridge found no diagnosis under axis I or II and assessed a current GAF of 65[9] with the highest in the past year of 70.

On June 5, 2007, plaintiff saw Dr. Christensen for a follow up on fatigue (Tr. at 358-362). Plaintiff reported not doing well; said she spends most of her days in bed with exhaustion. Plaintiff did not feel rested in the morning and was taking daytime naps after mild illnesses and extraordinary exertion. Plaintiff reported that her cognitive problems improved when she stopped taking Ambien, but she continued to have problems concentrating on tasks, remembering things, and following instructions. Plaintiff reported pain with immobility, exercise, and changes in the weather. She was lifting two-pound weights,

---

[8]Aphasia is a disorder that results from damage to portions of the brain that are responsible for language. For most people, these are areas on the left side (hemisphere) of the brain. Aphasia usually occurs suddenly, often as the result of a stroke or head injury, but it may also develop slowly, as in the case of a brain tumor, an infection, or dementia. The disorder impairs the expression and understanding of language as well as reading and writing.

[9]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

walking, and doing Pilates.  On exam, Dr. Christensen observed
that plaintiff was in no apparent distress, was alert and
oriented times three, and was pleasant and conversant.

Dr. Christensen wrote, "Patient met American College of
Rheumatology (ACR) tenderpoint criteria for fibromyalgia, but she
also had additional negative-control tenderpoints:  16/18 ACR
tenderpoints were positive, 1/3 standard negative-control points
were positive, 0/4 non-standard negative-control points were
positive, 0/2 non-standard positive-control points were positive,
and 3/9 non-ACR tender points were positive.  (With severe
disease, control points may be positive.)."  Dr. Christensen
refilled plaintiff's medications and told her to continue her
stretching exercises and return in two to three months.

On July 13, 2007, plaintiff was seen by Dr. Stevens for a
follow up on insomnia (Tr. at 323-324).  Plaintiff was using
Clonazepam which was working "fairly well. . . .  She has had no
new sleep complaints."  Dr. Stevens kept plaintiff on her same
medication and told her to return in a year.  "I think she will
require a long-term sleeping pill as a treatment for her insomnia
and clonazepam certainly appears to be working quite well at this
time."

On November 20, 2007, plaintiff saw Dr. Christensen for a
follow up on fatigue (Tr. at 341-344).  Plaintiff reported she

was "not doing well."  She reported sleeping 12 hours at night
and napping during the day.  "While she is trying to remain
active, she reports severe post-exertional fatigue.  She
describes going to 'Missouri Days' and then 'crashing' for a week
afterwards.  Her husband changed his shift hours, shifting some
household chores onto her, with which she finds it hard to cope.
She continues to do laundry and cleaning her home as she can
tolerate the activity."  Plaintiff reported having problems
concentrating on tasks, remembering things, and following
instructions.  Dr. Christensen performed a physical exam.  He
observed that plaintiff was in no apparent distress and was alert
and oriented times three, pleasant, and conversant.  He increased
plaintiff's Clonazepam to 4 mg per night to help with sleep, and
told her to return in two months.

On January 22, 2008, plaintiff saw Dr. Christensen for a
follow up on fatigue (Tr. at 352-355, 357).  "Since the last
visit, she has stumbled over a threshold, falling and bruising
her knees, she has also fallen going down the stairs at home,
striking the back of her head.  She reports that she feels woozy
or giddy, particularly when arising or standing.  She also
reports increased trouble with memory and cognitive function.
For example, she got lost in her home town looking for her
Doctor's office.  Finally, she reports increased problems holding

29

objects as well as having to steady herself as she moves about."
As far as fatigue, plaintiff said she was not doing well.  She
reported bad days and better days.  Plaintiff and her husband
reported that plaintiff was unable to care for herself.  She was
awaiting a decision on her disability application.

Her husband continued in his new hours, shifting some
household chores to her.  "She continues to do laundry and
cleaning her home as she can tolerate the activity."  Plaintiff
was sleeping 11 to 14 hours a night but did not feel refreshed in
the morning.  "She has no trouble falling asleep and she reports
she sleeps soundly through the night."  She continued to report
problems concentrating on tasks, remembering things, and
following instructions.  "She reports grieving her Father's death
in 1997."

Dr. Christensen performed a physical exam and observed
plaintiff to be in no apparent distress, alert and oriented times
three, pleasant and conversant, but depressed.  He asked
plaintiff to stand for five minutes while he counted her pulse.
It was the same at the beginning and the end.  She had premature
beats so he asked for an EKG.  The EKG showed a single PVC
(premature ventricular contraction) during the tracing.  Dr.
Christensen wrote, "Patient met American College of Rheumatology
(ACR) tenderpoint criteria for fibromyalgia, but she also had

additional negative-control tenderpoints:  14/18 ACR tenderpoints
were positive, 0/3 standard negative-control points were
positive, 2/4 non-standard negative-control points were positive,
2/2 non-standard positive-control points were positive, and 0/9
non-ACR tenderpoints were positive.  (With severe disease,
control points may be positive.)."  Dr. Christensen noted that
plaintiff "appeared stable" but he was concerned about her self-
reported incidents of stumbling and cognitive deficits which
could represent drug toxicity.  "Consequently, I have asked her
to hold off on the cyclobenzaprine for a couple of nights before
restarting this therapy, to limit the cyclobenzaprine to the hs
[at bedtime] dose, and to take only 3 mg of clonazepam a night.
If she does well with these changes, then she should have her
Zoloft increased to 100 on the next return to look for the
optimal dose for this drug."  Plaintiff was told to return in
February to see Dr. Afroze.

On February 18, 2008, plaintiff saw Aneesa Afroze, M.D., in
Dr. Christensen's office for a review of labs and symptoms (Tr.
at 349-351).  Plaintiff reported not feeling any better since
seeing Dr. Christensen on January 22, 2008.  She had restarted
her Cyclobenzaprine[10] due to joint pains.  "The patient comes
with her husband today who states that they have a stethoscope at

---

[10]The record refers to Flexeril which is another name for
Cyclobenzaprine.

home and he has been listening to her heart beat and feels that she has premature ventricular contractions irregularly. The patient does not have any symptoms of palpitation, does not relate her feeling dizzy with abnormal heart beat or symptoms of palpitations." Plaintiff had worn a Holter monitor for seven days and mailed it to the lab this day. Plaintiff's Zoloft was increased to 100 mg daily.

On June 30, 2008, plaintiff saw Dr. Christensen for a follow up (Tr. at 339-340, 345-348). Her chief complaint was fatigue. Plaintiff had stopped taking the Cyclobenzaprine on her own for four weeks. She found it harder to sleep and had more musculo-skeletal pain, so she restarted the medication. As far as fatigue, plaintiff said she was "not doing well." She reported bad days and better days. "Her husband continues in his new shift hours, this change has shifted some household chores (like pet care) onto her, which she still finds hard to accomplish. She continues to do laundry and cleaning her home as she can tolerate the activity." Plaintiff said she was awaiting her Social Security disability hearing. Plaintiff reported not feeling rested in the morning despite sleeping 11 to 14 hours a night. She reported having problems concentrating on tasks, word finding, remembering things, and following instructions. "She reports she is still grieving her Father's death in 1997." Dr.

Christensen observed that plaintiff was in no apparent distress, was alert and oriented times three, was pleasant and conversant, and appeared "in a better mood than at other times."  Dr. Christensen performed a physical exam.  He wrote, "Patient met American College of Rheumatology (ACR) tenderpoint criteria for fibromyalgia, she also had additional negative-control tenderpoints:  14/18 ACR tenderpoints were positive, 2/3 standard negative-control points were positive, 0/4 non-standard negative-control points were positive, 2/2 non-standard positive-control points were positive, and 3/9 non-ACR tenderpoints were positive. (With severe disease, control points may be positive.)."  Because plaintiff had lost a little weight, Dr. Christensen reduced her sertraline (treats depression) to 50 mg a day, because sertraline can cause weight loss.  He refilled her other medications and told her to return in three months.

On September 28, 2008, plaintiff was seen by Dr. Stevens for a follow up on insomnia, periodic limb movements, and chronic fatigue syndrome (Tr. at 321-322).  "I have not seen her since July 2007."  Dr. Stevens noted that as long as plaintiff takes Flexeril and Clonazepam, "she sleeps fairly well."  Plaintiff reported going to bed around 10 p.m. and getting up around 10 a.m.  "This is her typical sleep time, 12 hours.  She falls asleep within about 15 minutes and will wake up after about 4

hours to use the restroom, but she always falls back asleep."
Plaintiff reported waking up feeling unrefreshed. Plaintiff said
neither she nor her husband were aware of any leg movements, and
she did not believe leg movements were disrupting her sleep.
"She said she is still having flares of her chronic fatigue
syndrome." Dr. Stevens kept plaintiff's medications the same and
told her to come back in a year.

On November 3, 2008, plaintiff saw Dr. Christensen for a
follow up on fatigue (Tr. at 333-338). Plaintiff reported
numerous ups and downs and referred to her downs as "relapses."
"These typically occur after exertion or emotional stress. With
these episodes she retreats to her bed or recliner, remaining in
bed for all day, only getting up to use the toilet or to eat a
snack. She describes on[e] episode where her dog escaped from
his pen and killed the patient's pet duck despite her attempts to
rescue the duck. She found this episode terribly distressing,
causing her to retreat to her bed for several days. She reports
she is still upset, even though the event happened more than a
month ago."

As far as fatigue, plaintiff reported having bad days and
good days. "Her husband remains in his new shift hours (7 am - 3
pm), forcing her to assume some household duties, which she still
finds hard to accomplish. She continues to walk her dogs for

regular exercise.  Plaintiff reported problems concentrating on tasks, word finding, remembering things, and following instructions.  Plaintiff reported that changes in the weather exacerbate her pains.  "She again reports she is still grieving her Father's death in 1997."

Dr. Christensen refilled plaintiff's medications, and told her to come back in three months.  (Dr. Christensen's note indicates he reduced plaintiff's sertraline (treats depression) to 50 mg a day; however, he had already reduced her to 50 mg a day back on June 30, 2008).

On April 16, 2009, Dr. Christensen wrote a letter to whom it may concern.

> Mrs. Larson has been my patient since September 2006 and I have followed her on a regular basis since that time.  She is seen for Chronic Fatigue Syndrome and Fibromyalgia.  She has many symptoms attributable to the diagnoses, which include fatigue, post-exertional malaise, insomnia with frequent arousals and unrefreshed sleep, neck pain, feverishness, cognitive problems including concentrating on tasks, word finding, remembering things, following instructions, musculoskeletal pain exacerbated by cold weather, headaches, symptoms from anxiety and depression during periods of relapse.
>
> Ms. Larson underwent a Polysomnogram [sleep study] in September 2006, which revealed that she had periodic limb movement disorder, but the diagnosis was not termed severe enough to account for her significant fatigue.
>
> Ms. Larson is currently prescribed Clonazepam, Cyclobenza-prine, Zoloft, Ibuprofen, low-dose aspirin, and multi-vitamins.

Ms. Larson's impairments vary from day to day. Extreme exhaustion can occur after minimal exertion and emotional stress. Minimal physical activity can result in post-exertional fatigue, which may require an extended period of rest for her to recover her abilities. These complaints are consistent with her diagnosis.

Ms. Larson experiences fatigue and symptoms severe enough to frequently interfere with her ability to maintain the attention and concentration needed to perform even simple work tasks.

Because of her symptoms, Ms. Larson should be afforded the opportunity to change positions at will, and to sit, stand, or walk as frequently as necessary. She should be able to lay [sic] down during the day as needed to obtain relief from her fatigue and pain. These rest periods would be at unscheduled times, and could be for prolonged periods of time. Her ability to lift, bend, stoop, kneel, climb, squat, etc. is limited due to her fatigue and pain.

In my opinion, as a result of her impairments and symptoms, she is unable to engage in any work activity on a sustained basis, including sedentary work. Her degree of fatigue substantially limits her mobility and stamina to the degree that she cannot perform any substantial gainful activity. The intensity, frequency, and duration of the fatigue significantly reduces her ability to sustain productivity for eight hours a day, five days a week. The severity of the limitations have been present since at least September 2006 and have continued to the present.

(Tr. at 375).

In addition, plaintiff saw a rheumatologist in California three times during 2002; however, the records are completely illegible (Tr. at 196-198).

## C.   *SUMMARY OF TESTIMONY*

During the April 2, 2009, hearing, plaintiff and her husband testified; and Barbara Myers, a vocational expert, testified at

the request of the ALJ.

## 1. Plaintiff's testimony.

At the time of the hearing plaintiff was 50 years of age (Tr. at 19). Plaintiff has a high school education and took some college courses (Tr. at 19).

Plaintiff last worked on April 14, 2001 (Tr. at 19). She worked at Aramark Uniform Services in California (Tr. at 19). Plaintiff had worked at that job for 20 years and quit because she became ill (Tr. at 20). During that 20 years, she worked in data entry, accounts receivable, and purchasing (Tr. at 20). For about 18 years, she was a purchasing agent, but the company made some changes and moved her into accounts receivable for four months (Tr. at 21). She returned to purchasing and then was moved to data entry (Tr. at 21-22). Plaintiff worked a lot of overtime at her job (Tr. at 22).

In April 2001, she thought she had the flu (Tr. at 22). She came home from work with a 101° temperature, had no energy, had a sore throat, sore muscles and joints, and a headache (Tr. at 22). She took several rounds of antibiotics, was tested for lupus, then thought she had a connective tissue disease (Tr. at 22). Plaintiff finally found a doctor in California who specialized in chronic fatigue syndrome and fibromyalgia (Tr. at 22).

Plaintiff started seeing Dr. Christensen in September 2006 (Tr. at 23). At first she saw him every four to six weeks; now she sees him about every three months (Tr. at 23). When plaintiff first started seeing Dr. Christensen, she was having fevers, headaches, debilitating fatigue, pain in her muscles and joints, sensitivity to light and loud noises, cognitive problems, a bad memory, and problems with understanding and "word finding" (Tr. at 24). Her symptoms waxed and waned (Tr. at 24). When she woke up feeling bad, any exertion at all would exacerbate her symptoms (Tr. at 25). On good days, she could do things if she paced herself (Tr. at 25). "And if I overdo, then I'll go into a relapse." (Tr. at 25).

Plaintiff is married and has one grown step daughter (Tr. at 20). She is 5'7" tall and weighs about 130 pounds (Tr. at 21). If she feels good when she gets up, she tries to do things around the house but has to pace herself (Tr. at 20). She does a few loads of laundry and folds the clothes (Tr. at 20). "And I just try to stay as busy as my health will allow me, but like I said, I don't know from day to day how I'm going to feel. And if I over exert myself, I go into a relapse." (Tr. at 20-21). When plaintiff is having a bad day, her fatigue is similar to having the flu (Tr. at 27). Plaintiff has a "relapse" about every other week (Tr. at 27). Plaintiff defined a relapse as, "my body is

just zapped of energy, feels like I've got lead weights.  You
know, everything is heavy.  I'm either in the recliner, laying
[sic] back on the recliner or in bed, maybe not sleeping.
Sometimes sleeping, sometimes not sleeping, but not exerting
myself at all." (Tr. at 28).  Such a relapse can last "anywhere
from three days to three weeks" (Tr. at 28).  During a relapse
plaintiff does not do any household chores and she does not
shower because it is too fatiguing to stand that long (Tr. at
28).

Plaintiff sleeps about 12 hours every night (Tr. at 25).
She does not feel refreshed after sleeping (Tr. at 25).  Despite
taking Clonazepam and Flexeril, she has trouble falling asleep
(Tr. at 26).  Clonazepam makes her dizzy and causes blurred
vision (Tr. at 35-36).  Flexeril makes her drowsy (Tr. at 36).
She does not sleep during the day because her doctor has advised
her not to: "[H]e would rather me try to be as active as I can
without overdoing it, but he wants me to set limits for myself."
(Tr. at 36).  During relapses, plaintiff does take naps (Tr. at
36).

Plaintiff has also suffered from depression (Tr. at 29).
She has fibromyalgia which gets worse during her relapses -- she
has pain in her neck, shoulders, knees, fingers, and elbows,
although the pain moves around and is not always in the same

place (Tr. at 29-30). Plaintiff began having cognitive difficulties in 2001, and those have gotten progressively worse (Tr. at 30). Her cognitive problems are worse during her relapses (Tr. at 30). Plaintiff has had headaches since 2001 (Tr. at 31). Talking on the phone too long or being on the computer too long will make them worse and also cause more fatigue (Tr. at 31). Plaintiff had low-grade fevers when she first started seeing Dr. Christensen, but her temperature is normal now (Tr. at 31-32).

Plaintiff used to ride a bike 60 miles at a time, hike, and had a good social life with lots of friends (Tr. at 29). Since 2001 she has not been able to do those things (Tr. at 29). When she is having a relapse, she cannot do any household chores so her husband does them (Tr. at 33). Plaintiff's husband works as a prison guard from 7:00 a.m. to 3:00 p.m. Thursdays through Mondays (Tr. at 33). He drives plaintiff three hours one way to Columbia when she has an appointment with Dr. Christensen (Tr. at 33). Plaintiff can drive into town but she cannot drive long distances because it is too fatiguing (Tr. at 34). When plaintiff makes plans to do things with her friends, she has to wait and see how she is feeling that day before she knows whether she can meet someone (Tr. at 35).

**2.    Testimony of Thorn Larson.**

Thorn Larson had been married to plaintiff since 1987 (Tr. at 37).  Mr. Larson began working for the state of Missouri in April 2007 and transferred to the Chillicothe prison in September 2008 (Tr. at 38).  Plaintiff and her husband moved to Missouri in late 2002 (Tr. at 38).

Plaintiff stopped working in 2001 because of the chronic fatigue:  "She just couldn't get out of bed.  She was -- at that time, on the onset of this thing, she was down with this six weeks straight for, you know, couple months -- where she was just -- she was down.  She'd gone to the doctors complaining of this fatigue.  They did checks on her, and really couldn't do anything for her." (Tr. at 38).  Plaintiff's condition has gotten better because she is doing her best to rest and manage her symptoms (Tr. at 39).

Plaintiff needs a lot of sleep but the sleep she does get is non-restorative (Tr. at 39).  She cannot exert herself; she cannot plan activities because she does not know when she will have a good day or a relapse (Tr. at 39).  As far as the number of good days versus bad days, Mr. Larson testified, "She -- think she came out of that a little bit, but since then as the years have gone on, she has gotten worse." (Tr. at 39).  When asked what activities would cause her to have a "relapse," Mr. Larson

testified, "Just being too active, pushing it too far not knowing that limit, and then it catching up with her" (Tr. at 40). When asked for an example, Mr. Larson said that when plaintiff goes shopping, what another person can do in an hour will take her two hours to complete (Tr. at 40). Plaintiff also has trouble remembering things Mr. Larson has told her (Tr. at 40).

During a relapse, plaintiff will stay in bed for extended periods of time, only getting up to use the bathroom (Tr. at 40). He will cook and bring the food to her, she will sit up to eat and watch television, but then go back to sleep (Tr. at 40-41). She may sponge bathe instead of taking a shower; she has gone as long as a week without showering (Tr. at 41).

Plaintiff used to hike and ride a mountain bike but can no longer do those things (Tr. at 41). It has been four years since they took a vacation because she does not know whether she will be able to do "the activities of vacation" (Tr. at 41).

**3.    Vocational expert testimony.**

Vocational expert Barbara Myers testified at the request of the Administrative Law Judge.

The first hypothetical involved a person able to lift and carry 20 pounds occasionally and ten pounds frequently; stand and walk for two hours per day; sit for six hours per day; unable to climb ladders, ropes, or scaffolds or work at unprotected

42

heights; and able to perform all other posturals on an occasional
basis (Tr. at 43).  The vocational expert testified that such a
person could perform plaintiff's past relevant work as a
purchasing clerk as she performed it and as is normally performed
in the economy (Tr. at 43-44).

The vocational expert testified that anything more than 12
to 15 absences per year would be unacceptable (Tr. at 44).  If
the person had to take unscheduled breaks beyond those
customarily allowed on a daily basis, the person could not work
(Tr. at 44-45).  The need to lie down during the day would
preclude substantial gainful activity (Tr. at 45).

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge George Bock entered his opinion on
June 2, 2009 (Tr. at 8-14).  The ALJ found that plaintiff's last
insured date was December 31, 2006 (Tr. at 10).

Step one.  Plaintiff has not engaged in substantial gainful
activity since her alleged onset date (Tr. at 10).

Step two.  Plaintiff suffers from fibromyalgia syndrome/
fatigue, a severe impairment (Tr. at 10).

Step three.  Plaintiff's impairment does not meet or equal a
listed impairment (Tr. at 12).

Step four.  Plaintiff retains the residual functional
capacity to perform light work including the ability to lift and

carry ten pounds frequently and 20 pounds occasionally; sit for six hours per day; stand or walk for two hours per day; cannot climb ladders, ropes, or scaffolds; cannot work at unprotected heights; but can do all other postural activities occasionally (Tr. at 12). With this residual functional capacity, plaintiff can return to her past relevant work as a purchasing clerk and data entry clerk (Tr. at 14).

## VI. CREDIBILITY OF GORDON CHRISTENSEN, M.D.

Plaintiff argues that the ALJ erred in discrediting the opinion of treating physician Dr. Cristensen in his April 16, 2009, letter to whom it may concern in which he stated that plaintiff is unable to engage in any work activity on a sustained basis, "including sedentary work." (Tr. at 375).

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).

The ALJ had this to say about Dr. Christensen's opinion:

As for the opinion evidence, the undersigned gives great weight to the diagnoses of medical problems by her treating physician, Dr. Christensen, but gives little weight to his opinion that the claimant could not engage in work activity on [a] sustained basis. . . . [M]ost of his treatment was performed after her date last insured and was related to

44

periodic limb movement disorder.  It appears his assessment
was based more on medical findings after her date last
insured.  Moreover, these limitations appear to be largely
based on her subjective story, which is not credible.  Her
credibility is also reduced by the fact that she reported
pain at control points during her examination by this
doctor.

(Tr. at 13-14).

Dr. Christensen's opinion was rendered in April 2009 --
nearly two and a half years after plaintiff's last insured date.
He saw her only three times during the four months before her
insured status expired.  While a treating physician may provide a
retrospective diagnosis of a plaintiff's condition, the relevant
analysis is whether plaintiff was actually disabled within the
meaning of the Social Security Act prior to the expiration of her
insured status.  <u>Warren v. Shalala</u>, 29 F.3d 1287, 1290 (8th Cir.
1994); <u>Grace v. Sullivan</u>, 901 F.2d 660, 661 (8th Cir. 1990).

On September 5, 2006, plaintiff saw Dr. Christensen for the
first time.  During that visit, she told Dr. Christensen that
because of her illness, she spent "'April to November' 'in bed'
last year."  A review of the medical records from April to
November 2005 reveals that plaintiff saw Dr. Kim on April 4,
2005, and a nurse on June 10, 2005, but had no other medical
appointments until March 6, 2006.  On April 4, 2005, Dr. Kim
reviewed lab work and a bone density study of plaintiff's lumbar
spine, all of which was normal.  He recommended she exercise, eat

45

a healthy diet, and decrease her fat and salt intake.  She did
not mention being "in bed" at that time.  When plaintiff saw
Carol Constant, R.N., on June 10, 2005, she complained of
dizziness, lightheadedness, chest tightness, variable pulse, and
low blood pressure.  She was not able to associate these symptoms
with any activity or stress.  Her exam was normal.  Plaintiff
failed to tell Ms. Constant that she had been "in bed" since
April due to her impairments.  Finally, despite telling Dr.
Christensen that she was "in bed" from April to November, she
sought no other medical care during that debilitating time.  I
note also that when she saw Dr. Kim on March 6, 2006 -- after not
having seen any doctor for the past nine months and having been
"in bed" for seven months out of the past 11 -- plaintiff failed
to mention such a significant experience to Dr. Kim.  Instead,
she complained to Dr. Kim of aches and pains for the last three
weeks, but said the pain was "not too bad."

    The records do not support plaintiff's allegation to Dr.
Christensen that her symptoms caused her to spend seven months of
the previous year in bed.  Therefore, Dr. Christensen's treatment
of plaintiff began with subjective complaints that were not
credible.

    Plaintiff also told Dr. Christensen on that first visit that
she experienced cognitive changes such as a diminished ability to

concentrate, word searching, and forgetting telephone numbers. But plaintiff said that this problem "waxes and wanes."

Plaintiff told Dr. Christensen that she suffers from headaches but that two or three over-the-counter ibuprofen tablets relieve her headaches.

Although Dr. Christensen diagnosed chronic fatigue syndrome during that first visit, he changed his diagnosis by mid-October. He received the results of plaintiff's sleep study and decided that she suffered from "fatigue due to dysomnia due to periodic limb movement disorder." He told her to keep taking the Clonazepam because Clonazepam was effective in the management of this disorder, and plaintiff reported that it was already helping her sleep.

Plaintiff saw Dr. Christensen on November 14, 2006, for the final time before her last insured date. He tested her for fibromyalgia, but she had positive control tender points in addition to the American College of Rheumatology tender points. He continued her on Clonazepam for sleep, prescribed a muscle relaxer, and told her to go to physical therapy. As there are no physical therapy records before me, it appears that plaintiff did not participate in physical therapy.

Plaintiff had one more medical appointment before her insured status expired, although it was not with Dr. Christensen.

It was with a pulmonary specialist who reviewed plaintiff's sleep study with her.  Since plaintiff had been on Clonazepam, she had been able to fall asleep within 20 minutes, she was only waking up a couple times a night and she was always able to go back to sleep within five minutes, and she would wake up after nine to ten hours of sleep and feel fairly alert through the day.  Plaintiff denied any depression, anxiety, or other psychiatric complaints.  Dr. Stevens believed that plaintiff did not require treatment for periodic limb movement.  His plan for her was to continue taking Clonazepam and return in six months.  This can certainly be classified as conservative treatment.

Comparing Dr. Christensen's April 2009 opinion with plaintiff's condition at the end of her insured status, one finds significant differences.

a.   Plaintiff told Dr. Christensen in 2006 that she had no musculoskeletal pain and that her muscle and joint pains were not exacerbated by changes in the weather or emotional stress.  However, in his April 2009 opinion, Dr. Christensen  noted that plaintiff's musculoskeletal pain was "exacerbated by cold weather, . . . [and] symptoms from anxiety and depression".  The first time plaintiff complained of cold weather exacerbating her aches and pains was February 27, 2007 -- after her last insured date.  Plaintiff did not complain about worsening symptoms after

periods of stress until November 3, 2008 -- well after her last insured date. Plaintiff's statement that weather and stress did not exacerbate her pain was made less than four months before her last insured date; therefore, the statements in Dr. Christensen's April 2009 report that contradict that do not relate back to her condition while she was insured.

b. In his April 2009 opinion he did not believe that periodic limb movement disorder would account for her fatigue; however, the last time he saw plaintiff before her last insured date, he did indeed believe that periodic limb movement disorder was the root of her problems.

c. In his April 2009 opinion he wrote that plaintiff's extreme exhaustion can occur after emotional stress; however, the first such complaint does not appear in the medical records until November 3, 2008.

d. In his April 2009 opinion he wrote that plaintiff's fatigue and symptoms are severe enough to interfere with her ability to maintain the attention and concentration needed to perform "even simple work tasks." However, in his September 2006 record, when he wrote about cognitive difficulties, he titled it "self reported cognitive changes" and was careful to point out multiple times that this was plaintiff's belief or report as opposed to any finding by him:

49

> **She reports** a diminished ability to "concentrate," meaning
> **she believes** she has diminished ability to comprehend and
> retain spoken and written information.  **She also reports**
> word searching and she is forgetful of telephone numbers.
> This problem waxes and wanes, but is generally worse when
> her fatigue is most severe.  Finally, **she reports** that since
> becoming ill she is more emotional than **she believes** is
> normal for her.

Dr. Christensen never did any cognitive testing, never made any mention in any of his notes of any observations by him or anyone in his office of plaintiff having any cognitive difficulties, and made no findings of cognitive impairment.

e.   In his April 2009 opinion, Dr. Christensen stated that plaintiff needed to lie down during the day as needed to obtain relief from fatigue and pain, that her breaks to lie down would be at unscheduled times, and that they may need to be for prolonged periods of time.  There are no records (not before plaintiff's last insured dated or after) in which plaintiff complains of a need to lie down during the day.  There are no records by any doctor recommending that plaintiff lie down during the day for prolonged periods.  Dr. Christensen consistently recommended stretching exercises; other doctors recommended that plaintiff exercise.

f.   In his April 2009 opinion, Dr. Christensen limited plaintiff's ability to lift, bend, stoop, kneel, climb, squat, "etc." due to fatigue and pain.  None of his records ever mention any of these functions, neither by way of plaintiff complaining

50

of difficulty performing them nor him recommending that she avoid them.

It is clear from the above that the opinion rendered by Dr. Christensen in his April 2009 letter is (1) largely unsupported by his own notes, and (2) not a description of plaintiff's condition prior to her last insured date. This opinion does not provide a retrospective diagnosis. Therefore, the ALJ did not err in giving "little weight" to the opinion of Dr. Christensen as expressed in that April 2009 letter.

## VII. SSR 99-2p

Plaintiff argues that the Commissioner ignored SSR 99-2p in its response to plaintiff's brief. SSR 99-2p reads in part as follows:

> Under the CDC [Center for Disease Control] definition, the diagnosis of CFS [Chronic Fatigue Syndrome] can be made based on an individual's reported symptoms alone once other possible causes for the symptoms have been ruled out. However, the foregoing statutory and regulatory provisions require that, for evaluation of claims of disability under the Act, there must also be medical signs or laboratory findings before the existence of a medically determinable impairment may be established.

> The following medical signs and laboratory findings establish the existence of a medically determinable impairment in individuals who have CFS. Although no specific etiology or pathology has yet been established for CFS, many research initiatives continue, and some progress has been made in ameliorating symptoms in selected individuals. . . .

> For purposes of Social Security disability evaluation, one or more of the following medical signs clinically documented over a period of at least 6 consecutive months establishes

the existence of a medically determinable impairment for individuals with CFS:

- Palpably swollen or tender lymph nodes on physical examination;

- Nonexudative pharyngitis;

- Persistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points; [footnote:  There is considerable overlap of symptoms between CFS and Fibromyalgia Syndrome (FMS), but individuals with CFS who have tender points have a medically determinable impairment. Individuals with impairments that fulfill the American College of Rheumatology criteria for FMS (which includes a minimum number of tender points) may also fulfill the criteria for CFS. However, individuals with CFS who do not have the specified number of tender points to establish FMS, will still be found to have a medically determinable impairment.] or,

- Any other medical signs that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record.

\* \* \* \* \*

When an adjudicator finds that an individual with CFS has a medically determinable impairment, he or she must consider that the individual has an impairment that could reasonably be expected to produce the individual s symptoms associated with CFS, as required in 20 CFR 404.1529(b) and 416.929(b), and proceed to evaluate the intensity and persistence of the symptoms. Thus, if an adjudicator concludes that an individual has a medically determinable impairment, and the individual alleges fatigue, pain, symptoms of neurocognitive problems, or other symptoms consistent with CFS, these symptoms must be considered in deciding whether the individual's impairment is "severe" at step 2 of the sequential evaluation process and at any later steps reached in the sequential evaluation process. If fatigue, pain, neurocognitive symptoms, or other symptoms are found to cause a limitation or restriction having more than a minimal effect on an individual's ability to perform basic work

activities, the adjudicator must find that the individual has a "severe" impairment.

As discussed above, the ALJ found that plaintiff's chronic fatigue syndrome was a severe impairment.

For those impairments that do not meet or equal the severity of a listing, an assessment of residual functional capacity (RFC) must be made, and adjudication must proceed to the fourth and, if necessary, the fifth step of the sequential evaluation process. In assessing RFC, all of the individual's symptoms must be considered in deciding how such symptoms may affect functional capacities.

In assessing the plaintiff's residual functional capacity, the ALJ found plaintiff's subjective complaints not entirely credible, a finding that was not challenged by plaintiff in this appeal and a finding which I find to be without error. The residual functional capacity assessment was based on the credible evidence in the record: The ALJ found that, at the time plaintiff was last insured, she could carry ten pounds frequently and 20 pounds occasionally; sit for six hours per day; stand or walk for two hours per day; could not climb ladders, ropes, or scaffolds; could not work at unprotected heights; but could do all other postural activities occasionally. Plaintiff's fatigue was accounted for by limiting her to a range of light work including only two hours of walking or standing per day.

In citing SSR 99-2p, plaintiff argues that "SSA's current litigation position is completely contrary to its own ruling." Plaintiff fails to explain how that is the case, and it is not

obvious to me.  The Commissioner found that plaintiff suffers from fibromyalgia syndrome/fatigue.  Plaintiff does not explain how that is any different from wording it "Chronic Fatigue Syndrome."  SSR 99-2p explains that chronic fatigue syndrome can be a severe impairment, and the ALJ so found.  Plaintiff's argument has no merit.

## VIII. CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 1, 2011